887 F.2d 1295
 58 USLW 2221, 105 P.U.R.4th 526
 MICHIGAN CONSOLIDATED GAS COMPANY, et al., Plaintiffs-Appellants,
v.
PANHANDLE EASTERN PIPE LINE COMPANY, Defendants-Appellees.
NATIONAL STEEL CORPORATION and Panhandle Eastern Pipe Line
Company, Plaintiffs-Appellees,
v.
William E. LONG and Edwyna G. Anderson, Defendants-Appellants.
 Nos. 88-1650, 88-1680, 88-1774, 88-1858.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 30, 1989.
Decided Oct. 6, 1989.
Rehearing Denied Nov. 3, 1989.
 
 Joseph A. Fink, Brian J. Renaud, Dickinson, Wright, Moon, Van Dusen & Freeman, Lansing, Mich., Jeffrey M. Petrash (argued), Washington, D.C., for Mich. Consol. Gas Co., plaintiffs-appellants.
 Donald L. Keskey and Henry J. Boynton (argued), Asst. Attys. Gen., Lansing, Mich., for State of Mich. and Mich. Public Service Com'n, plaintiffs-intervenors.
 Daniel J. Demlow, Sandra L. Jasinski, James A. Ault, Honigman, Miller, Schwartz & Cohn, Lansing, Mich., William F. Braeuninger, Monroe, Mich., for Mich. Gas Utilities Co., plaintiff-intervenor.
 Raymond N. Shibley (argued), LeBoeuf, Lamb, Leiby & MacRae, Washington, D.C., Donald L. Keskey and Henry J. Boynton, Asst. Attys. Gen., Lansing, Mich., Roderick S. Coy, Martha R. Moyer, Douglas H. West, Hill, Lewis, Adams, Goodrich & Tait, Carson Grunewald, James A. Smith, Dennis J. LeVasseur, Vincent J. Tatone, Bodman, Long & Dahling, Detroit, Mich., Dennis J. Kelley, Houston, Tex., Richard Zomnir, Babst, Calland, Clements & Zomnir, Pittsburgh, Pa., Daniel J. Demlow, James A. Ault, Honigman, Miller, Schwartz & Cohn, Lansing, Mich., William F. Braeuninger, Monroe, Mich., for Dennis J. Levasseur and Panhandle Eastern Pipe Line Co., defendants-appellees.
 Richard C. Sanders, Jean G. Schtokal, Roderick S. Coy, Martha R. Moyer, Douglas H. West (argued), Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., for National Steel Corp., defendant-appellant.
 Donald L. Keskey and Henry J. Boynton (argued), Asst. Attys. Gen., Louis J. Caruso, Sol. Gen., Lansing, Mich., for William E. Long and Edwyna G. Anderson, defendants-appellants.
 Jerome M. Feit (argued), Frank R. Lindh, F.E.R.C., Washington, D.C., amicus curiae.
 Roberta L. Halladay, Morgan, Lewis & Bockins, Washington, D.C., for amicus curiae, United Distribution Companies.
 Anne L. Hammerstein, Office of Atty. Gen., Columbus, Ohio, for amicus curiae, Ohio Public Utilities Com'n.
 John F. Ebbott, Public Service Com'n of Wis., Madison, Wis., amicus curiae.
 Frederic Moring, Crowell & Moring, Washington, D.C., for amicus curiae, Associated Gas Distributor.
 Richard J. Aaron, Lomis, Ewert, Ederer, Parsley, Davis & Gotting, Lansing, Mich., for amicus curiae, Southeastern Mich. Gas Co., Michigan Gas Co. and Battle Creek Gas Co.
 George C. Vena, Ark. Public Service Com'n, Little Rock, Ark., amicus curiae.
 Before MERRITT, Chief Judge, and MILBURN, Circuit Judge, and LIVELY, Senior Circuit Judge.
 MILBURN, Circuit Judge.
 
 
 1
 In these consolidated actions, appellants Michigan Consolidated Gas Company ("MichCon"); Michigan Gas Utilities Company ("MGU"); the State of Michigan; the Michigan Public Service Commission ("MPSC"); and William E. Long and Edwyna G. Anderson appeal the summary judgment granted against them by the district court on the ground that Michigan's authority to regulate the interstate transportation of natural gas in this "bypass" of a local distribution company is preempted by federal law. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 Appellants MichCon and MGU are Michigan corporations that provide natural gas and related services, such as storage and transportation, in Michigan. Appellant MPSC is the state agency that regulates public utilities in Michigan, and appellants William E. Long and Edwyna G. Anderson were Commission members when these consolidated actions were filed in the district court.
 
 
 3
 Appellee Panhandle Eastern Pipe Line Company is an interstate pipeline company. Like MichCon and MGU, it is a "natural gas company" within the meaning of the Natural Gas Act of 1938, 15 U.S.C. Sec. 717a(6) ("the Act"). Panhandle therefore falls within the regulatory reach of the Federal Energy Regulatory Commission ("FERC") as well as, under certain circumstances, the MPSC.
 
 
 4
 Panhandle has supplied MichCon and other Michigan utilities with natural gas for more than fifty years. The Panhandle pipeline involved in this case runs from the State of Texas through Michigan and happens to cross through the industrial area of the City of Detroit, where appellee National Steel Corporation's ("National Steel") Great Lakes Steel Division plant is located. National Steel is an integrated steelmaker and was MichCon's second largest customer until July 1988, when it tapped directly into the Panhandle pipeline.
 
 
 5
 This case involves the "bypass" or direct transportation of natural gas from the wellhead in the State of Oklahoma to the ultimate consumer in Michigan. For many years, pipeline companies purchased natural gas at the wellhead from natural gas producers, transported it through pipelines, and then resold it at wholesale to local distribution companies ("LDCs"), such as MichCon and MGU. Producers sold natural gas in the interstate market under federal certificates at federally regulated prices. Interstate pipelines bought, transported, and sold natural gas under federal certificates at federally regulated prices. The LDCs resold natural gas at retail to ultimate consumers (sales to the "burner tip") under state certificates at state regulated prices. See Associated Gas Distrib. v. FERC, 824 F.2d 981, 993-97 (D.C.Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988); Public Serv. Comm'n v. FERC, 610 F.2d 439, 441 (6th Cir.1979).
 
 
 6
 In 1978, Congress adopted the Natural Gas Policy Act, 15 U.S.C. Secs. 3301-3432, which reduced the FERC's discretion in controlling natural gas prices at the wellhead, eliminated many licensing requirements, and facilitated competition in interstate and intrastate markets. Then, in the early 1980s, supplies of oil and natural gas surged and prices dropped. These developments prompted fundamental changes in the natural gas industry. Of particular relevance to this case was the "unbundling" of the pipelines' functions as wholesalers and transporters of natural gas.
 
 
 7
 Today, instead of buying from pipeline companies, LDCs and large consumers often buy natural gas at the wellhead directly from producers and then hire pipeline companies to transport it to LDCs, which distribute the natural gas to the burner tips. National Steel, for example, began purchasing natural gas directly from wellhead sources in Oklahoma and Louisiana in 1986, and hired pipelines to transport the natural gas to Michigan. The pipelines then delivered National Steel's natural gas to MichCon. Panhandle, for example, charged approximately 41 cents per 1,000 cubic feet of natural gas for transportation over many hundreds of miles. MichCon then transported the natural gas about five miles to the Great Lakes Steel Division, a service for which it charged approximately 80 cents per 1,000 cubic feet.
 
 
 8
 In September 1985, Panhandle agreed to add fittings and pipes to permit National Steel to tap its pipeline at the Great Lakes Steel Division. The agreement provided that National Steel would purchase natural gas in Oklahoma and hire Panhandle to transport the natural gas directly to its steel mill in Detroit, bypassing the MichCon local network and the higher transportation rates authorized by the MPSC for natural gas transported on MichCon's system. National Steel claims that the bypass will save it approximately $10 million annually in energy costs and that such savings are necessary if it is to remain competitive with foreign steelmakers. It further claims that if this bypass is disallowed, it will turn to another energy source rather than resume purchasing natural gas from MichCon.
 
 
 9
 MichCon and the other appellants counter that if this bypass stands, it will have a devastating impact on the State of Michigan's utility structure and, ultimately, its economy. They depict Panhandle's agreement as "market raiding" and "cream skimming," and warn that it sets the precedent for sweetheart deals with Michigan's other large natural gas consumers, which will result in massive cost shifting that will leave small businesses and individual consumers as the sole support for the state's utilities network.
 
 B.
 
 10
 On December 12, 1985, Panhandle applied to the FERC for a certificate of public convenience and necessity under section 7(c) of the Act, 15 U.S.C. Sec. 717f(c), authorizing the bypass and construction of the facilities necessary to connect it. On January 27, 1987, after conducting hearings on the matter, an FERC Administrative Law Judge recommended approving Panhandle's application. MichCon and the MPSC filed exceptions, but in a decision issued September 10, 1987, the FERC adopted the ALJ's recommendation and authorized the bypass and all necessary construction. MichCon and the MPSC petitioned for judicial review of FERC's decision, arguing that it had exceeded its jurisdiction and incorrectly construed section 7(c). On August 18, 1989, the United States Court of Appeals for the District of Columbia Circuit denied the petition for review and upheld the FERC's authorization of the bypass, holding that the bypass "involves merely interstate transportation of natural gas," and not local distribution. Michigan Consol. Gas Co. v. FERC, 883 F.2d 117 (D.C.Cir.1989).
 
 
 11
 Meanwhile, on July 30, 1987, while Panhandle's application was still pending before the FERC, MichCon filed a formal complaint against the pipeline company with the MPSC. On September 14, 1987, four days after the FERC authorized the bypass, Panhandle and National Steel filed an action in the United States District Court for the Western District of Michigan, arguing that by entertaining MichCon's complaint, the MPSC was interfering with the exclusive jurisdiction of FERC over the interstate transportation of gas. Panhandle and National Steel sought declaratory relief and an injunction prohibiting the alleged interference.
 
 
 12
 MichCon responded by filing an action in the Wayne County, Michigan, Circuit Court the next day. MichCon sought injunctive relief in its state action, claiming that Panhandle's FERC certificate was insufficient authority for the bypass and that Panhandle would violate Michigan law by delivering gas to National Steel without MPSC approval. The State of Michigan, the MPSC, and MGU intervened as plaintiffs, and National Steel intervened as a defendant. Panhandle then removed MichCon's state case to the district court, where it was consolidated with Panhandle's pending action.
 
 
 13
 On September 29, 1987, the MPSC issued an order that prohibited Panhandle from constructing the bypass connections and delivering gas to National Steel until it found the proposed service to be in the public interest. The MPSC then scheduled hearings on the matter.
 
 
 14
 On November 2, 1987, the district court issued a preliminary injunction enjoining Panhandle from delivering gas to National Steel, but it did not enjoin the construction of the bypass connections. The district court then tried the consolidated cases on stipulated evidence, briefs, and oral argument. In its decision issued June 16, 1988, and reported at National Steel Corp. v. Long, 689 F.Supp. 729 (W.D.Mich.1988), the district court found the bypass did not constitute "local distribution" as defined by the Act, dissolved the injunction, and held that the Act preempted application of Michigan law to the FERC-certificated bypass. MichCon, MGU, the State of Michigan, the MPSC, William Long and Edwyna Anderson filed timely notices of appeal to this court in late June and early July 1988. As Panhandle had completed its construction work during the course of litigation in the district court, it connected the bypass and began delivering gas to National Steel on July 1, 1988.
 
 
 15
 The primary issues raised in these consolidated appeals are: (1) whether the Panhandle-National Steel bypass constitutes "local distribution" of gas within the meaning of the Act; and (2) whether the MPSC can exercise jurisdiction over the bypass.
 
 II.
 A.
 
 16
 These consolidated appeals present a case of first impression in this circuit; viz., the application of the Natural Gas Act ("the Act") to bypass transportation of natural gas in interstate commerce and the issue of federal preemption by the Act of state regulation in such a situation--questions of law which are subject to de novo review upon appeal. See Pullman-Standard v. Swint, 456 U.S. 273, 287-88, 102 S.Ct. 1781, 1789-90, 72 L.Ed.2d 66 (1982). It is uncontested that the Act applies in this case, as "[g]as crossing a state line at any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey." Maryland v. Louisiana, 451 U.S. 725, 755, 101 S.Ct. 2114, 2134, 68 L.Ed.2d 576 (1981). However, in resolving the issues in this case, a review of the language and policies of the Act is appropriate.
 
 
 17
 By 1938, in a series of Commerce Clause cases, the Supreme Court established that states could regulate the intrastate and interstate transportation and sale of natural gas to ultimate consumers, but they could not reach indirect sales for resale, such as a pipeline's sale to an LDC for resale. See Schneidewind v. ANR Pipe Line Co., 485 U.S. 293, 108 S.Ct. 1145, 1151, 99 L.Ed.2d 316 (1988); Panhandle Eastern Pipe Line Co. v. Public Serv. Comm'n of Indiana ("Panhandle/Indiana "), 332 U.S. 507, 514-15, 68 S.Ct. 190, 193-94, 92 L.Ed. 128 (1947). The states' inability to regulate wholesale natural gas transactions handicapped their ability to regulate the natural gas industry and left consumers at the mercy of producers and pipeline companies. See Panhandle/Indiana, 332 U.S. at 515-16, 68 S.Ct. at 194-95. Congress responded with the Act, "a comprehensive scheme of federal regulation of 'all wholesales of gas in interstate commerce....' " Northern Nat. Gas Co. v. State Corp. Comm'n, 372 U.S. 84, 91, 83 S.Ct. 646, 650, 9 L.Ed.2d 601 (1963) (quoting Phillips Pet. Co. v. Wisconsin, 347 U.S. 672, 682, 74 S.Ct. 794, 799, 98 L.Ed. 1035 (1954)).
 
 
 18
 Through the Act, Congress delegated to the Federal Power Commission (now the FERC) "exclusive jurisdiction over the transportation and sale of gas in interstate commerce for resale." Schneidewind, 108 S.Ct. at 1151. The Act was drawn very meticulously and has been interpreted narrowly to affect only those areas that were outside of the states' regulatory reach at the time it was passed. See id. at 1153; Panhandle/Indiana, 332 U.S. at 516-17, 68 S.Ct. at 194-95; Federal Power Comm'n v. Hope Nat. Gas Co., 320 U.S. 591, 610, 64 S.Ct. 281, 291-92, 88 L.Ed. 333 (1944). The three things Congress specifically intended to draw within its regulatory power in the Act were (1) the interstate transportation of natural gas; (2) wholesale natural gas transactions in interstate commerce; and (3) natural gas companies engaged in interstate transportation or wholesale sales. Panhandle/Indiana, 332 U.S. at 516, 68 S.Ct. at 194-95. The result is that "[t]he natural gas industry is subject to interlocking regulation by both federal and state authorities." Northwest Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas, --- U.S. ----, 109 S.Ct. 1262, 1271, 103 L.Ed.2d 509 (1989).
 
 B.
 
 19
 The Act specifically excludes "the local distribution of natural gas" from FERC jurisdiction.[1] In this case, the appellants argue that the FERC did not have jurisdiction over the Panhandle-National Steel bypass because it amounted to the "local distribution of natural gas," which is not permitted in Michigan without MPSC approval. See M.C.L.A. Secs. 460.501-.506. However, we agree with the district court, National Steel Corp., 689 F.Supp. at 734-36, and the District of Columbia Circuit, Michigan Consol. Gas Co., 883 F.2d 117, 121-23, that the Panhandle-National Steel bypass "involves merely interstate transportation of natural gas" (which is subject to FERC jurisdiction) and not local distribution. In this case it is undisputed that the retail sale of natural gas occurs in Oklahoma, where National Steel purchases it for its use at its plant in Detroit. Thus,
 
 
 20
 Panhandle's role under the arrangement is simply to transport National's gas from one state to another across several intervening states. It is hardly conceivable that a transaction could fit more neatly into the category of "transportation of natural gas in interstate commerce."
 
 
 21
 Michigan Consol. Gas Co., 883 F.2d 121.
 
 
 22
 In agreeing with this conclusion, we decline the appellants' implied invitation to enlarge the exceptions for state jurisdiction in section 1(b) of the Act to include their "functional equivalents." Given the careful and continuing attention that Congress has focused on the natural gas industry, we are of the view that if Congress had intended to except the "functional equivalent" of "local distribution" from federal jurisdiction, it would have stated so by now.[2]
 
 C.
 
 23
 Having rejected the appellants' contention that this case falls within the "local distribution exception" to the Act, and having determined that the bypass lies within FERC's jurisdiction, it remains for us to determine whether the state's ability to regulate the bypass has been preempted. Congressional power to preempt state law originates in the Supremacy Clause of Article VI of The Constitution of the United States. Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). Preemption may be express or implied, but in either case, the question is one of congressional intent. California Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 281, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). As the Act does not expressly mention preemption of state law in the case of bypass transportation, we turn to the question of implied preemption:
 
 
 24
 In the absence of explicit statutory language, however, Congress implicitly may indicate an intent to occupy a given field to the exclusion of state law. Such a purpose properly may be inferred where the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where "the object sought to be obtained by the federal law and the character of obligations imposed by it ... reveal the same purpose." [citations omitted] Finally, even where Congress has not entirely displaced state regulation in a particular field, state law is preempted when it actually conflicts with federal law. Such a conflict will be found " 'when it is impossible to comply with both state and federal law, [citations omitted], or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.' "
 
 
 25
 Schneidewind, supra, 108 S.Ct. at 1150-51.
 
 
 26
 Where a preemption question involves the Act, we bear in mind that with "unusual legislative precision," Panhandle/Indiana, 332 U.S. at 517, 68 S.Ct. at 195-96, Congress extended federal jurisdiction only to "the field of matters relating to wholesale sales and transportation of natural gas in interstate commerce." Schneidewind, 108 S.Ct. at 1153. We also are mindful that "every state statute that has some indirect effect on rates and facilities of natural gas companies is not pre-empted." Id. at 1155.
 
 
 27
 We recognize that the Act contains a meticulously drawn statement of federal jurisdiction with the intent of creating a comprehensive regulatory scheme that supplements existing state regulations. Panhandle/Indiana, 332 U.S. at 520-21, 68 S.Ct. at 196-98. However, it is clear to us that this case involves the imminent possibility of a "collision" between state and federal regulatory power that would disrupt this comprehensive scheme. Indeed, it appears that one collision occurred in September 1987, when the MPSC ordered Panhandle to suspend its bypass plans after the FERC had approved them. As MichCon argues, it is true that the Supreme Court has recognized that there might be "some overlaps or conflicts" in "dual regulation" situations. Panhandle Eastern Pipe Line Co. v. Michigan Pub. Serv. Comm'n, 341 U.S. 329, 336, 71 S.Ct. 777, 781, 95 L.Ed. 993 (1951). Yet, we believe Schneidewind compels a result different from that which MichCon and the other appellants argue.
 
 
 28
 In Schneidewind, the Supreme Court faced the question of whether the Act preempted state regulation of natural gas companies' issuance of long-term securities. Based upon "the imminent possibility of collision between [the state's securities regulation] and the [Act]," the Court concluded that the state's securities regulation was preempted. Schneidewind, 108 S.Ct. at 1156. The Court explained that "[i]f the MPSC ever denied a natural gas company authority to issue a security under [the state statute] for a FERC-approved project, the disagreement between state and federal authorities over the wisdom of the project and its proposed financing would interfere with the federal regulatory scheme." Id. Similarly, if the MPSC denied Panhandle's bypass transportation of natural gas in this case, such a decision would conflict with the FERC approval and "interfere with the federal regulatory scheme" of the interstate transportation of natural gas.
 
 
 29
 Additionally, this matter involves several other factors which lead us to the conclusion that Congress has implicitly preempted state regulation of the Panhandle-National Steel bypass. We have already noted that the purpose of the Act was to provide for federal regulation of the interstate transportation of gas, which was outside of state regulatory reach when the Act was enacted. Thus, we believe that in establishing a comprehensive regulatory network, Congress intended to occupy a field which the states could not reach. Similarly, to allow the MPSC to regulate the bypass in this case would obstruct the execution of the complementary relationship between state and federal regulation established by the Act. Were we to permit the MPSC to cancel the FERC's approval of the Panhandle-National Steel bypass, we would subordinate federal regulatory power to state regulatory power in the complete absence of authority to do so.
 
 
 30
 The appellants further argue that the Act provides for several areas in which state and federal regulatory commissions have dual jurisdiction. However, the cases and situations they cite involve sequential jurisdiction, such as federal jurisdiction over the interstate transportation of gas from the wellhead to the LDC, and state regulation from the LDC to the burner tip. In this case, where Panhandle is not engaged in local distribution, but in the direct interstate transportation and delivery of natural gas, the dual jurisdiction MichCon and the other appellants seek is not sequential but simultaneous. Moreover, we find nothing in the Act nor in relevant case law that contemplates or supports the notion of simultaneous state and federal regulation of the interstate transportation of natural gas. Therefore, as the Supreme Court held that there was no room within the federal domain to allow the MPSC to regulate the issuance of long-term securities by gas companies in Schneidewind, we are of the view that the MPSC may not regulate Panhandle's interstate transportation of natural gas.
 
 III.
 
 31
 For the foregoing reasons, we conclude that the Panhandle-National Steel bypass involves only the interstate transportation of natural gas, and that the Act preempts MPSC regulation over the bypass. Therefore, the summary judgment of the district court is AFFIRMED.[3]
 
 ORDER
 
 32
 This matter is before the court upon consideration of the petition for rehearing by appellants Michigan Consolidated Gas Company, Michigan Gas Utilities Company, State of Michigan, Michigan Public Service Commission, William E. Long and Edwyna G. Anderson of this court's October 6, 1989 opinion affirming the decision of the district court.
 
 
 33
 Having carefully examined the petition and the record, this court finds it misapprehended no question of law or fact in its October 6, 1989 order.
 
 
 34
 It is therefore ORDERED that the petition for rehearing be, and it hereby is, denied.
 
 
 
 [1]
 The pertinent section of the Act relevant to this appeal is section 1(b) of the Act, 15 U.S.C. Sec. 717(b), which provides:
 The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas. (Emphasis supplied).
 
 
 [2]
 We also note, as did the Court of Appeals in the District of Columbia, that we decide this matter without considering the level of deference that is due to an agency's determination that it has jurisdiction under the statute it enforces. See Michigan Consol. Gas Co., 883 F.2d 122 n. 3
 
 
 [3]
 There is no claim here that the court should abstain from deciding this case under the principles articulated in Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc., 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986); New Orleans Public Service, Inc. v. Council of City of New Orleans, --- U.S. ----, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989), and CSXT, Inc. v. Pitz, 883 F.2d 468 (6th Cir.1989). Therefore, the court has no occasion to address the issue of abstention by a federal court in favor of state administrative proceedings